UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 09-11678-RWZ

DIAHANN L. GROSS

v.

SUN LIFE ASSURANCE COMPANY OF CANADA


ORDER

January 6, 2012

ZOBEL, D.J.

Plaintiff brings this action against Sun Life Assurance Company of Canada ("Sun Life") under section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for wrongful denial of long term disability insurance benefits ("LTD benefits").  Before me are cross-motions for summary judgment on the administrative record (Docket ## 40, 44).

**I.  Statement of Facts**

Plaintiff worked as an office manager and optician at Visionfirst, SLAC 1247, 1259,[1] which offered its employees a long term disability plan ("the Plan") insured by Sun Life.  SLAC 2487-2534.  She participated in the Plan and qualified for LTD benefits if, because of "injury or sickness, [she was] unable to perform the Material and Substantial Duties of [her] Own Occupation."  SLAC 2498.  The parties agree that the

---

[1] In keeping with the parties' abbreviations, the administrative record will be cited as "SLAC [page number(s)]."

physical aspects of her occupation were properly classified as "light work." SLAC 2575,

1069.[2]

### A.  Plaintiff's Claim

In October 2006, at the age of 34, plaintiff filed a claim for LTD benefits as of

August 2006 based on reflex sympathetic dystrophy ("RSD"), fibromyalgia, and

headaches.[3]  SLAC 1259-63, 1277.  In support of her claim, she provided medical

records from her past and current treating physicians, including Dr. Rita Egan.  Dr.

Egan also completed an Attending Physician's Statement, which described plaintiff's

physical limitations as permanent and the only treatment as "medications." SLAC 1277,

1281.  Dr. Egan limited the amount of time plaintiff could perform certain activities daily

as follows: standing/walking (1-4 hours), sitting (1-3 hours), and driving (1-3 hours).

SLAC 1279.  She also indicated that plaintiff had no ability to push, pull, crawl, grasp,

use her right hand or firmly grasp with the left hand, and had little to no ability to bend,

squat, climb, twist her body, balance, kneel, or reach. Id.  She further described

plaintiff's "physical impairment" as "severe limitation of functional capacity; incapable of

minimum (sedentary) activity." Id.

---

[2] An October 2006 Occupational Analysis characterized plaintiff's job as "Office Administrator aka Practice Manager" according to U.S. Department of Labor classifications, and described her duties as requiring, among other things, "a light exertion level – i.e., lifting, carrying, pushing, pulling up to 20 lbs. occasionally, 10 lbs frequently and/or frequent standing and walking."  SLAC 2575.  Although a later vocational analysis clarified that her job was better characterized as "Optician, Dispensing" rather than "Practice Manager," the physical demands for both are very similar and both are classified by the Department of Labor as requiring "light work." SLAC 1069.

[3] Dr. William Witt, with whom plaintiff treated briefly, diagnosed her with "complex regional pain syndrome" ("CRPS").  SLAC 111.  Sun Life's review also considered whether plaintiff was "disabled" under the Plan by CRPS.

Plaintiff also submitted the results of a February 19, 2007 "functional capacity evaluation" ("FCE"), conducted by physical therapist Chris Kaczmarek, which she arranged at her own expense.   Kaczmarek concluded that plaintiff could not work based on her functional level.  SLAC 3155.  Among other things, Kaczmarek cited how plaintiff "ambulated into the clinic with a very erratic pattern characterized by poor foot control and frequent dragging of toes," described her poor balance, and several times noted that her right arm was "limp" and unable to be used or tested.  SLAC 3147, 3149. Kaczmarek also cited plaintiff's report that she was "utilizing an assistive device for ambulation," required "usage of her left arm for pulling herself out of a chair," and was unable to "perform an unassisted squat to the ground safely without falling and not being able to get up from the ground."  SLAC 3149.

### B.  Sun Life's Review

Loretta Dionne, R.N., and Dr. James Sarni reviewed plaintiff's claim and medical files on behalf of Sun Life.  SLAC 3064-67; 3096-98.  Neither confirmed a finding of RSD, CRPS, or fibromyalgia.  SLAC 3067, 3098.[4]  In January 2007, Dr. Sarni recommended that plaintiff be evaluated by a neurologist, who "should be able to comment intelligently upon the right upper extremity and whether or not they believe it is consistent with complex regional pain syndrome or RSD and what steps could be taken to both diagnose and treat it."  SLAC 2098.

---

[4] Nurse Dionne recommended that Dr. Sarni "review this file in regard to the RSD or CRPS diagnosis and fibromyalgia. [She did] not see where [plaintiff] meets criteria for these conditions." SLAC 3067.  Dr. Sarni found that "documentation does not strongly support a diagnosis of [RSD or CRPS]. That diagnosis is best made through various sympathetic neural blockades and there is no evidence that this was done.  Furthermore, [plaintiff] did have a three-phase bone scan and this was also normal." SLAC 3098.

Accordingly, Sun Life arranged for plaintiff to undergo an Independent Medical Evaluation ("IME") by neurologist Dr. Rukmaiah Bhupalam on February 22, 2007.  In his report, Dr. Bhupalam noted that plaintiff's "sensory exam appears to be functional" and "there is no conclusive evidence for complex regional pain syndrome[.]" SLAC 748. He also noted, however, that she had "tenderness and weakness all over," needed "significant assistance and support even [in] moving from [the] chair to examination table," and was unable to use her right hand. Id.  Dr. Bhupalam further described his observation of plaintiff's motor skills:

> [H]er husband has to help her from lying to sitting position, sitting to lying position, and also moving from chair to bed, and she could not move her leg on her own.  On examination, she has considerable "weakness" in right upper and lower extremities. She could not lift right upper extremity above her shoulder. . . . She could not perform finger-to-nose testing in the right upper extremity. On station and gait testing, she had considerable difficulty getting up from sitting position to standing; however, her husband was sitting close by. She slid herself off the examination table, was able to balance herself with difficulty.  Her husband was helping her through[out] the examination.  She tended to lean towards right or left side and tended to fall. She was not able to stand still without support.  She did take a few steps sliding one leg after the other in a form of astasia/abasia,[5] appeared to be functional gait.

SLAC 745-46. He recommended that she receive "behavioral specialist/ psychologist/ psychiatric care" because she "probably has emotional factors that could be contributing to her pain symptomatology." SLAC 748.  Dr. Bhupalam concluded that plaintiff was unable to return to her prior occupation and was "totally disabled even for sedentary work even on a part time basis."  Id.

---

[5] Motor incoordination with an inability to stand or walk despite normal ability to move the lower limbs when sitting or lying down, a form of hysterical ataxia.  Dorland's Illustrated Medical Dictionary 167 (30th ed. 2003).

In the meantime, Sun Life conducted video surveillance of the plaintiff over three days in November 2006, and over six days in January and February 2007—including on February 22, the day of the IME.  SLAC 90-99; 616-21; 677-89. Among other things, surveillance shows plaintiff driving alone for extended periods of time (e.g., 1 ½  hours, SLAC 94; 2 hours, SLAC 679), including driving for four hours in one day, without stopping on the two-hour return trip, SLAC 683.  The footage also shows her kneeling down to the lower level of shelves and turning while extending her arms overhead to retrieve items while shopping, SLAC 619; entering and exiting her car, walking quickly, and walking 75 to 100 feet at a highway rest stop, all without assistance or apparent difficulty, SLAC 678-79, 683; and pumping gas with her right hand while standing and shifting her weight between her feet, SLAC 678-79.  Both the four-hour drive and the gas-pumping incident occurred on the day before the IME. On the day of the IME, surveillance shows plaintiff leaving her residence with her husband who drove her to the appointment and exiting the doctor's office in a wheelchair being pushed by her husband, SLAC 680-81. Upon plaintiff's return home, however, surveillance shows her standing up without the assistance of her husband.  SLAC 682.

Sun Life sent the video surveillance to Dr. Bhupalam on March 20, 2007.[6]  After review of the surveillance footage, Dr. Bhupalam issued an April 5, 2007 addendum to his initial report, in which he noted the discrepancy between plaintiff's appearance and

---

[6] Plaintiff's allegations that Dr. Bhupalam changed his opinion after Sun Life "contacted him repeatedly, and paid him another $1200," Docket # 41 at 20, are not borne out by the record.  Sun Life sent Dr. Bhupalam a letter asking that he review the additional "claims related investigation material on Ms. Gross" and advise Sun Life "if this new information impacts your assessments and conclusions as written in your February 22, 2007f IME report of Ms. Gross." SLAC 753.  Dr. Bhupalam sent Sun Life a bill for his services, six days after issuing the addendum to his report.  SLAC 809.

activity at the IME and while under surveillance. SLAC 794.   He explained that his

previous report was based on an office examination of plaintiff, but that, even at the

time of the IME, "there were questions about validity of her sensory examination and

motor examination, especially with weakness and inability to use her right upper

extremity and inability to transfer from the bed to the chair and bed to examination

table, etc. and requiring full assistance."  SLAC 794.  By contrast, on the surveillance

videos:

> It does appear that she can use both upper and lower extremities quite well
> and her gait also appears to be normal, and she does not appear to be in
> any pain or discomfort in the video recorded on February 21, 2007 just a day
> before my evaluation in the office.  Even on the videos that were done in
> November and January, it appears that she can function quite well based on
> my review of the video.

Id.  Dr. Bhupalam concluded that plaintiff "can function quite well and probably will be

able to return to her previous occupation as a manager in a multi physician

ophthalmology and optometric office."  Id.

Around April 10-11, 2007, Sun Life consulted with Dr. William Hall who—after

reviewing plaintiff's claim file, including all medical information and surveillance

footage—agreed with Dr. Bhupalam's revised conclusions. SLAC 879-85.  While Dr.

Hall found that plaintiff's medical records supported "her reported subjective symptoms"

and "provisionally" supported a diagnosis of RSD in plaintiff's right arm and hand,

SLAC 884, those records did not identify any new or worsening symptoms reported

when plaintiff's claimed disability began, id..  Moreover, "surveillance videography . . .

compellingly weighs against, provisional medically limiting diagnosis [of] RSD [in the]

6

right arm and hand and corresponding right arm and hand activity restrictions." SLAC
885.  Dr. Hall also concluded that plaintiff's records failed to "provide compelling
support" for a diagnosis of fibromyalgia and did not "substantively address [a] diagnosis
of chronic, ocular or transformed migraine."  SLAC 884-85.

### C.  Sun Life's Denial and Plaintiff's Appeal

In an April 23, 2007 letter, Sun Life notified plaintiff that it had denied her claim, and explained the review process and conclusions reached by nurse Dionne, and Drs. Sarni, Bhupalam, and Hall.  SLAC 813-19.  Sun Life also explained that plaintiff's activities while under surveillance "show a capacity for activity that far exceeds the activity described on your completed claim forms."  SLAC 816. Following a 60-day extension, plaintiff appealed the denial on December 19, 2007.  SLAC 926-74.  She argued that Sun Life unreasonably credited the opinions of its own medical professionals and Dr. Bhupalam's second opinion over the findings and opinions of her healthcare providers and therapist Kaczmarek, SLAC 943-57, and further argued that Sun Life did not consider the effect of her medications on her ability to function, SLAC 951.[7]

In response, Sun Life asked Dr. Alan Neuren to conduct an independent peer review of plaintiff's files.  SLAC 1089-95.  Dr. Neuren targeted the contrast between her reported appearance and behavior when seen by healthcare providers versus when under surveillance.  Dr. Neuren concluded that this difference could only reasonably be explained by plaintiff's "deliberate[ ] embellish[ment of] her symptoms to her providers

---

[7] Plaintiff argues that Sun Life failed to consider the "cognitive component" of her occupation, dismissing the "debilitating impact" of her multiple daily medications on her "ability to think clearly." Docket # 41 at 10.  This argument fails. She does not identify anything in the record documenting limitations on her due to the side effects from medication. Indeed, Dr. Egan left blank the "Mental Impairment" portion of her Attending Physician's Statement. SLAC 1281.  See Speciale v. Blue Cross, 538 F.3d 615, 622 (7th Cir. 2008) (in undertaking a vocational analysis, insurer not obligated to consider side effects from medication where none of the side effects were listed as restrictions by plaintiff's doctors).

Plaintiff also contends that Sun Life incorrectly classified her occupation, SLAC 938-939.  That error was immaterial given that plaintiff was still evaluated for the capacity to perform "light work."  SLAC 1069.  See supra, note 2.

for secondary gain." SLAC 1093-94. He concluded that there was no evidence of "functional impairment" from August 2006 to the present. SLAC 1094.

On January 23, 2008, Sun Life notified plaintiff of, and explained the reasons behind, its decision to uphold the denial of benefits. SLAC 1099-1106. Ten months later, plaintiff's counsel submitted additional information to Sun Life, including the Social Security Administration's determination in August 2008 that plaintiff was disabled and entitled to SSDI benefits. SLAC 1125-29. Sun Life refused to consider these supplemental submissions given that plaintiff had exhausted her administrative remedies under ERISA. SLAC 1241-42.[8]

## II. Standard

Review of the record in an ERISA case differs from review in an ordinary summary judgment case; in the former, the "non-moving party is not entitled to the usual inferences in its favor." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). Where, as here, the Plan administrator has discretion to determine eligibility for benefits, I must uphold the administrator's decision unless it is arbitrary, capricious, or an abuse of discretion.[9] See Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 212-13 (1st Cir. 2004) (internal quotation marks omitted). Put differently, "the administrator's decision must be upheld if it is reasoned[10] and supported by substantial evidence." Id. at 213. "Evidence is substantial if it is reasonably sufficient to support a

---

[8] Due to a clerical error, plaintiff's post-appeal denial submissions were included in the claim file.
[9] See Order of March 8, 2011, endorsing denial of Docket # 35, plaintiff's motion to apply de novo review.
[10] In the ERISA context, the terms "abuse of discretion," "arbitrary and capricious," and "reasonableness" are functionally equivalent. Denmark v. Liberty Life Assur. Co. of Boston, 566 F.3d 1, 7 (1st Cir. 2009).

conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." Id.

## III.  Analysis

Plaintiff argues that Sun Life's denial was not supported by substantial evidence because Sun Life credited the opinions of its reviewing doctors and Dr. Bhupalam over those of plaintiff's treating physicians and therapist Kaczmarek.  Plan administrators, however, "are not obligated to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). See also id. at 834 (further holding that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").  Indeed, a plan administrator need not rely at all on the opinion of an examining physician.  Gannon, 360 F.3d at 216. See also id. (citing Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 10, 12 (1st Cir. 2003)(upholding an insurer's termination of disability benefits in which supporting medical evidence consisted solely of an independent medical consultant's review of the claimant's file)).

Here, Sun Life credited the opinions of doctors who reviewed plaintiff's file and surveillance footage that directly conflicted with limitations recognized by her healthcare providers and claimed by plaintiff.  While the weight given to surveillance depends on the "amount and nature of the activity observed," Maher v. Massachusetts General Hosp. Long Term Disability Plan, 2011 WL 6061347, at *6 (1st Cir. Dec. 7, 2011), even "sporadic surveillance capturing limited activity" may be used to uphold termination of benefits, particularly where videos show plaintiff engaging in activities

that specifically contradict her claims as to "how she spent her time and what activities she could tolerate." Id. (citing Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 229 (1st Cir. 2010)).  See also Tsoulas v. Liberty Life Assur. Co. of Boston, 454 F.3d 69, 78-9 (1st Cir. 2006)(crediting surveillance report that showed claimant conducting activities that directly contradicted her reported limitations); Gannon, 360 F.3d at 214-15 (concluding that it was reasonable for insurer to consider surveillance report as one more piece of evidence in support of its decision to terminate plaintiff's disability benefits because the report undermined the treating physician's opinion about plaintiff's work limitations); Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 31-32 (1st Cir. 2001) (crediting surveillance report that directly conflicted with treating physician's opinions that claimant had virtually no ability to perform physical tasks).

Plaintiff also argues that Sun Life failed to consider the Social Security Administration's award of disability benefits.  It is inappropriate to consider this evidence since the disability benefits were awarded and brought to Sun Life's attention long after plaintiff had exhausted ERISA's administrative procedures.  See Orndorf, 404 F.3d at 517 (considering extra-administrative record evidence would "offend the interests in finality and exhaustion of administrative procedures required by ERISA"); Lopes v. Metropolitan Life Ins. Co., 332 F.3d 1, 5 (1st Cir. 2003)(recognizing the "strong presumption that the required deferential review of a plan administrator's benefits decision should be limited to the evidentiary record presented to the administrator"); id. ("[I]t is anomalous to suggest that an administrator acted

unreasonably by ignoring information never presented to it.") (internal quotation marks omitted).

Finally, plaintiff contends that Sun Life suffered from a conflict of interest— namely, that claims personnel are evaluated and compensated based on their denial of disability claims—which rendered it incapable of making a fair decision. Since Sun Life is both the payer and adjudicator of claims under the Plan, an inherent structural conflict exists. Denmark, 566 F.3d at 7 (a conflict exists "whenever a plan administrator, whether an employer or an insurer, is in the position of both adjudicating claims and paying awarded benefits") (citing Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348-50 (2008)). Such a conflict is just one factor among many which I may consider in evaluating a denial of benefits. Glenn, 128 S.Ct. at 2351 ("[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."). It may be appropriate to weigh a conflict of interest more heavily, if, for example, "circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." Id.

Here, none of the circumstances justifies weighing the conflict more heavily than any other pertinent consideration. Plaintiff does not claim, much less offer evidence, that Sun Life has a history of biased claims administration. Furthermore, her allegations that Sun Life's claims personnel are compensated based on their claims denial rate is speculative, unsupported, and flatly refuted by defendant's supporting

affidavit.  <u>See</u> Docket # 47 Ex. A.   Finally, the mere fact that Sun Life's bottom line is

affected by its decision to deny plaintiff's claim does not justify giving the conflict of

interest any additional weight.  <u>Cf. Wright v. R.R. Donnelley & Sons Co. Group Benefits</u>

<u>Plan</u>, 402 F.3d 67, 75 (1st Cir.2005) ("The fact that a plan administrator will have to pay

the plaintiff's claim out of its own assets does not change the arbitrary and capricious

standard of review.") (internal citations quotation marks omitted).

        The record shows that Sun Life relied on numerous factors in determining that

plaintiff was not eligible for benefits, including review by nurse Dionne, Dr. Sarni, and

Dr. Hall, surveillance footage, independent medical evaluation by Dr. Bhupalam, and

independent peer review by Dr. Neuren.   This evidence is reasonably sufficient to

support Sun Life's decision to deny plaintiff's claim for LTD benefits, and I therefore find

that its decision was not arbitrary, capricious or an abuse of discretion.

**IV.  Conclusion**

        Defendant's motion for summary judgment (Docket # 44) is GRANTED.

Plaintiff's motion for summary judgment (Docket # 40) is DENIED.  Judgment shall be

entered accordingly.


    _____January 6, 2012_____                _____/s/Rya W. Zobel_____
              DATE                                    RYA W. ZOBEL
                                              UNITED STATES DISTRICT JUDGE